Earl Benjamin BUSH et al., Plaintiffs,

v.

**ORLEANS PARISH SCHOOL BOARD**
et al., Defendants.

Civ. A. No. 3630.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 3, 1961.

A. P. Tureaud, New Orleans, La., for plaintiffs.

M. Hepburn Many, U. S. Atty., Prim B. Smith, Jr., First Asst. U. S. Atty., New Orleans, for the United States, amicus curiae.

Jack P. F. Gremillion, Louisiana Atty. Gen., William P. Schuler, George M. Ponder, Asst. Louisiana Attys. Gen., for Jack P. F. Gremillion, as Louisiana Atty. Gen., Wade O. Martin, Jr., as Louisiana Secretary of State, A. P. Tugwell, as Louisiana State Treasurer, Roy H. Theriot, as Louisiana State Comptroller, Shelby M. Jackson, as Louisiana State Supt. of Education, and Louisiana State Bd. of Education and individual members thereof.

872

Clarence C. Wood, Baton Rouge, La., for Wade O. Martin, Jr., Louisiana Secretary of State.

W. Scott Wilkinson, Shreveport, La., for Legislature of Louisiana and Edward LeBreton, Charles Deichmann, Risley C. Triche, P. P. Branton, Welborn Jack, Vial Deloney, William Cleveland, E. W. Gravolet and Emile A. Wagner, Jr.

Gerard A. Rault, New Orleans, La., for F. Otway Denny, Robert C. Hickerson, Edward J. Penado, John Singreen and Emile A. Wagner, Jr.

Samuel I. Rosenberg, New Orleans, La., for Orleans Parish School Bd.

Before RIVES, Circuit Judge, and CHRISTENBERRY and WRIGHT, District Judges.

Once again,[1] irresponsible conduct on

1. The Orleans Parish school desegregation controversy has been in the federal courts for more than eight years.

In 1954, the state adopted a constitutional amendment, LSA–Const. art. 12, § 1, and two segregation statutes. The amendment and Act 555 purported to re-establish the existing state law requiring segregated schools. Act 556 provided for assignment of pupils by the school superintendent. On February 15, 1956, this court held that both the amendment and the two statutes were invalid. The court issued a decree enjoining the School Board, "its agents, its servants, its employees, their successors in office, and those in concert with them who shall receive notice of this order" from requiring and permitting segregation in the New Orleans schools. Bush v. Orleans Parish School Board, D.C., 138 F.Supp. 337, 342, affirmed 5 Cir., 242 F.2d 156, certiorari denied 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436.

Not only was there no compliance with that order, but immediately thereafter the Legislature produced a new package of laws, in particular Act 319 (1956) which purported to "freeze" the existing racial status of public schools in Orleans Parish and to reserve to the Legislature the power of racial reclassification of schools. On July 1, 1958, this court refused to accept the School Board's contention that Act 319 had relieved the Board of its responsibility to obey the desegregation order. In the words of the court, "any legal artifice, however cleverly contrived, which would circumvent this ruling [of the Supreme Court, in Brown v. Board of Education, 347 U.S. 483 (74 S.Ct. 686, 98 L.Ed. 873)] and others predicated on it, is unconstitutional on its face. Such an artifice is the statute in suit." Bush v. Orleans Parish School Board, D.C., 163 F.Supp. 701, 702, affirmed 5 Cir., 268 F.2d 78. See also, Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281.

Nevertheless, the Legislature continued to contrive circumventive artifices.

In 1958 a third group of segregation laws was enacted, including Act 256, which empowered the Governor to close any school under court order to desegregate, as well as any other school in the system. In the first court test of this law it was struck down as unconstitutional by this court on August 27, 1960. Bush v. Orleans Parish School Board, 187 F.Supp. 42.

On July 15, 1959, the court ordered the New Orleans School Board to present a plan for desegregation, Bush v. Orleans Parish School Board, No. 3630, but there was no compliance. Therefore, on May 16, 1960, the court itself formulated a plan and ordered desegregation to begin with the first grade level in the fall of 1960.

For the fourth time, in its 1960 session, the Legislature produced a packet of segregation measures, this time to prevent compliance with the order of May 16, 1960. Four of these 1960 measures—Acts 333, 495, 496 and 542—and the three earlier acts referred to above—Act 555 of 1954, Act 319 of 1956 and Act 256 of 1958—were declared unconstitutional by a three-judge court on August 27, 1960, in the combined cases of Bush v. Orleans Parish School Board and Williams v. Davis, and their enforcement by "the Honorable Jimmie H. Davis, Governor of the State of Louisiana, and all those persons acting in concert with him, or at his direction, including the defendant, James F. Redmond," was enjoined. Bush v. Orleans Parish School Board, D.C., 187 F.Supp. 42, 45. At the same time, the effective date of the desegregation order was postponed to November 14, 1960. On this date the School Board began good faith compliance with the court's order.

At the First Extraordinary Session of 1960, however, the Louisiana Legislature adopted a new series of measures designed to thwart the orders of this court. Even after integration was an accomplished fact, the Legislature sought to defeat it. On November 30,

the part of some Louisiana officials compels us to the unpleasant but necessary task of issuing further injunctions. As before, the campaign is aimed at the duly elected Orleans Parish School Board which, in good faith, continues to comply with the orders of this court requiring desegregation of the public schools of New Orleans. A further effort is made to remove the entire Board and replace it with a new group appointed by the Legislature. Act 4, 3d Ex.Sess.1960. And, in case the frontal assault should fail, a series of flanking maneuvers has been initiated. Among these are the Secretary of State's refusal to certify the recent re-election of one Board member, a resolution purportedly "addressing out of office" the superintendent of schools elected by the present Board, Sen.Conc.Res. 7, 3d Ex. Sess.1960, and a statute which seeks to deprive the Board of its attorney and force upon it the State Attorney General, Act 5, 2d Ex.Sess.1960.

In view of our reiterated injunction expressly prohibiting the Legislature, the Governor, the Attorney General and other state officials from "interfering in any way with the administration of the public schools for Orleans Parish by the Orleans Parish School Board,"[2] it is difficult to understand these recent actions which so plainly violate the orders of the court. Certainly Louisiana's legislators cannot seriously have expected us to condone new devices for reestablishing an unjust racial discrimination which the highest court in the land has repeatedly condemned as unconstitutional. On the other hand, we are reluctant to assume that this is defiance merely for the sake of defiance, for it is unthinkable that, without even the excuse of possible success, a state would deliberately expose its citizenry to the unseemly spectacle of lawgivers, sworn to uphold the law, openly flouting the law.

Totally ignoring our previous finding to the contrary, they now insist that interference with the elected school board of Orleans Parish has nothing whatever to do with resistance to integration of the public schools of Orleans Parish. We are assured that the substitute school board, the new superintendent and the new school board attorney will all be bound by the outstanding orders of this court, and it is argued that a harmless change in personnel cannot affect the implementation of constitutional rights, hence, does not concern the federal tribunals. In short, we are told that the new legislation is pointless, or, at most, constitutes an innocent domestic amusement.

But, even if we were so disposed, we could not ignore the background of the new legislation. These are not the first blooms of a new spring. This litigation is now in its ninth year and the record is a chronology of delay, evasion, obstruction, defiance and reprisal. Nor is the state administration or the legislature which sponsored the measures

1960, this court held Acts numbered 2, 10 through 14, and 16 through 23, as well as House Concurrent Resolutions Nos. 10, 17, 18, 19 and 23, unconstitutional. Bush v. Orleans Parish School Board, 188 F.Supp. 916.

Undeterred, in its Second Extraordinary Session for 1960, the Louisiana Legislature passed further measures to frustrate the Orleans Parish School Board in its effort to comply with the orders of the court. On December 21, 1960, Act 2 and House Concurrent Resolutions 2, 23 and 28 of this session, Acts 1960, pp. 74, 85, 89, were declared unconstitutional and the enforcement of Act 5, now before us, was temporarily

restrained. Bush v. Orleans Parish School Board, D.C., 190 F.Supp. 861.

The Third Extraordinary Session produced the measures under consideration here. A Fourth Special Session was abortive, but, at this writing, the Louisiana Legislature has just adjourned from its Fifth Extraordinary Session, the product of which has yet to be evaluated.

2. See Bush v. Orleans Parish School Board, 187 F.Supp. 42, 45; temporary injunction issued November 30, 1960, on opinion reported at 188 F.Supp. 916; temporary injunction issued December 21, 1960.

under consideration a faceless new body. At the behest of the same Governor, the same legislators have recently concluded an unprecedented Fifth Special Session, and the pattern of their labors is more than familiar. Without attending all they have said and done, we must at least notice such of their past actions as have come to our judicial attention, and these are enough to make up a complete catalog of resistance to constitutional authority. No one needs reminding how many efforts have been made in recent weeks alone to oust the elected school board of New Orleans notwithstanding the orders of this court. Against this history, who will say, without strong evidence, that Louisiana's officials have suffered a change of heart and that the measures now before us are harmless details of internal administration?

But it is not only the guilty past that condemns these recent acts. The very circumstances of their birth robbed them of innocence. Indeed, if there were no ulterior motive, no larger purpose to be served, why so much ado about so little? Is such a triviality as the replacement of the attorney for a single local school board, or even a change in the personnel of the board itself, a matter of sufficient gravity and urgency to require a special session of the state legislature?[3] Are these causes for which a Governor dispenses with usual delays and certifies the necessity for "emergency" legislation?[4] Do such questions normally provoke the highest state court to shortcut appellate procedures by exercising its extraordinary "supervisory" jurisdiction?[5] Through its official declarations the government of Louisiana has itself exposed the new legislation.

No further proof is needed, but there is more. As already noted in our earlier decision[6] granting a temporary restraining order against its enforcement, the real object of Act 5 of the Second Special Session was dramatically revealed by the Attorney General himself when, moments after relieving the School Board's regular attorney, he sought to withdraw pending motions by the Board without even consulting his client. The vice of the more recent measures is disclosed in the text itself. Thus, as a premise to establishing a new

3. Under the Louisiana Constitution, Art. 5, § 14, LSA, the Governor may convene the Legislature in special session "on extraordinary occasions." Of the legislative measures now before us, one was adopted at the Second Extraordinary Session of 1960 (Act 5), and two at the Third Extraordinary Session (Act 4 and Sen.Conc.Res. 7).

4. According to the endorsements thereon, Act 5, 2d Ex.Sess.1960, was certified as emergency legislation by the Governor on December 12, 1960, three days before its passage, and Act 4, 3d Ex.Sess.1960, was so certified on January 12, 1961, the day of passage. By virtue of this certification both measures become immediately effective upon approval by the Governor, instead of 20 days after the end of the session in which each was adopted. See La.Const. Art. 3, § 27. The measure purporting to address out of office the superintendent of the Orleans Parish schools (S.Conc.Res. 7, 3d Ex.Sess.1960), being a resolution, presumably became effective when concurred in by the House of Representatives without the necessity of such a certificate.

5. On December 3, 1960, a judge of the Nineteenth Judicial District Court of Louisiana, without a hearing, granted a restraining order directed to the Governor and other state officers enjoining them from enforcing Act 2 of the Second Extraordinary Session of 1960, the predecessor of the present measure creating a new school board for Orleans Parish. Before a hearing on the motion for preliminary injunction could be had, and by-passing the Court of Appeals, the Louisiana Supreme Court granted certiorari, and, in less than two weeks, issued its decree reversing the district judge. In its opinion the Louisiana Court noted that it "will not ordinarily exercise its supervisory jurisdiction in cases such as this," but did so here "because of the statewide and extraordinary public interest and importance" of the matter. Singelmann v. Davis, 240 La. 929, 125 So.2d 414, 415.

6. See Bush v. Orleans Parish School Board, 190 F.Supp. 861.

legislatively appointed board, Act 4 of the Third Special Session pointedly recites earlier acts and resolutions purporting to abolish the elected board which this court has already ruled unconstitutional. And the resolution ousting the superintendent of the New Orleans schools, Sen.Conc.Res. 7, 3d Ex. Sess.1960, assigns as the sole "reasonable cause" for removal [7] his failure, in obedience to the orders of the court, to recognize these invalid laws. Similarly, the only excuse offered by the Secretary of State for his refusal to certify the re-election of Mr. Sutherland to the Orleans Parish School Board is the claim that, under the same unconstitutional statutes, the office was abolished.

The pattern is obvious. The ultimate goal remains to block desegregation of the public schools and frustrate the enjoyment of constitutional rights. The method is to wrest control of the New Orleans schools from the elected board and, incidentally, to punish the members of that board and its faithful employees for complying with the mandate of the court. But, since our orders stand in the way of that design, the immediate effect of the measures is to defy the authority of this court.

In the circumstances, the United States, as amicus curiae, actively intervened and is the moving party on the applications now before us. Since the immediate effect of the recent legislative measures is to frustrate orders of a court of the United States and the primary reason for enjoining those acts is to vindicate the authority of that court, this seems altogether appropriate.[8] Nevertheless, defendants strenuously object, claiming that the government has no interest in this private litigation and should not be permitted to stand in for the original plaintiffs. In view of the compelling precedent in the parallel case of Faubus v. United States, 8 Cir., 254 F.2d 797,[9] we might reject the objection summarily, especially since it

7. The Louisiana Constitution, Art. 9, § 3, permits the Legislature to "address" out of office any "officer" for "reasonable cause." It seems doubtful that the parish superintendent of schools is an "officer" within this provision. State ex rel. Harvey v. Stanly, 173 La. 807, 138 So. 845. On the contrary, it appears that he can only be removed by the board which elected him for the causes specified in LSA–R.S. 17:54, and, then, only after hearing. See Bourgeois v. Orleans Parish School Board, 219 La. 512, 53 So.2d 251. Moreover, even if the superintendent is subject to removal by the Legislature, it might be questioned whether obedience to the orders of a court of the United States constitutes a "reasonable" cause under the Louisiana Constitution. In the circumstances, however, it is unnecessary to decide these matters of local law.

8. This is not to say that the original plaintiffs or the Orleans Parish School Board, as cross-claimants, would not have had standing to seek the relief requested here by the United States. On the contrary, since the ultimate goal of the measures under consideration is to deny the plaintiffs enjoyment of their constitutional rights, they might properly have brought these applications. And the School Board, as the victim of these measures of reprisal and as the guardian of the school children of the community, also has sufficient interest to ask for these injunctions. See Brewer v. Hoxie School Dist. No. 46, 8 Cir., 238 F.2d 91. But this is no way contradicts the distinct interest of the United States in protecting the integrity of its courts.

9. Two reasons are giving why Faubus should not be deemed a binding precedent, the first being that the plaintiffs there had filed an application identical to that of the United States, so that discussion of the government's right, as amicus curiae, to obtain injunctive relief was mere obiter dicta; the second, that the legislative history of the Civil Rights Act of 1957 was not brought to the court's attention in that case. The first point has some merit, but the fact is that, whether required to do so or not, the Court of Appeals did rule on the propriety of the government's participation, and that opinion even if dicta, carries some weight. As to the other distinction, assuming the allegation to be correct, we must assume that the Court of Appeals would have found the argument based on the history of the Civil Rights Act no more persuasive than we have.

is, at best, a delaying tactic.[10] But we deem it important to state unequivocally the right of the United States to appear in these proceedings because it involves a principle vital to the effective administration of justice.

The arguments advanced by the state's representatives reveal a complete misconception of the government's role. Accordingly, it is important to emphasize *when, how* and for *what reason* the United States entered the case. On November 25, 1960, the court invited the Attorney General and the United States Attorney to participate by the following order:

"It is ordered that the United States be, and it is hereby, requested and authorized to appear in these proceedings as *amicus curiae*, by and through the Attorney General of the United States and the United States Attorney for the Eastern District of Louisiana, to accord the court the benefit of its views and recommendations with the right to submit to the court pleadings, evidence, arguments and briefs, and to initiate such further proceedings as may be appropriate, in order to maintain and preserve the due administration of justice and the integrity of the judicial processes of the United States."

The date is significant. The United States intervened long after this court had finally declared plaintiffs' right to attend desegregated public schools, and after the time set for the practical implementation of that constitutional right. The merits had been adjudicated and the only matter remaining was the enforcement of the court's injunction. It was only when the Governor, the Legislature, and other officials of the State of Louisiana attempted to interpose the power and prestige of the state in a massive effort to frustrate the court's decrees that we called upon the United States as a friend of the court. It should also be stressed that the government appeared *at the court's request*. The Justice Department was not intervening to protect a special interest of its own. Nor was it to champion the rights of the plaintiffs or defend the harassed School Board. It came in, by invitation, to aid the court in the effectuation of its judgment, "to maintain and preserve the due administration of justice and the integrity of the judicial processes of the United States."

Against this background all defendants' authorities are irrelevant. In the present context it is immaterial that in adopting the Civil Rights Acts of 1957 and 1960, 42 U.S.C.A. § 1971 et seq., Congress failed to authorize the Attorney General to initiate desegregation proceedings.[11] That is not the government's role here. In the first place, this case was in the courts, at the instigation of private litigants, for more than eight years when the United States made its appearance, so that the Justice Department could hardly be said to have "initiated" the proceedings. Moreover, even now, the Attorney General does not seek to advise the court on the merits, for the case on the merits is long since closed. As we have said, the government entered the case only to vindicate the authority of the court. Nothing in the history of the recent civil rights legislation indicates that Congress sought to withdraw the right of the United States to intervene under these circumstances. On the contrary, the Senate debates on the Civil Rights Act of 1957 show the opponents of "Part III" of the original bill which

---

10. As just stated, note 8, supra, either the original plaintiffs or the Orleans Parish School Board might properly have brought these applications. Hence, even if we were to dismiss the present petitions, the next day the same relief could be requested by another party and the defendants would have gained nothing.

11. See "Part III" of H.R. 6127, 85th Cong., 1st Sess., as originally introduced, rejected by the Senate. Cong.Rec., 85th Cong., 1st Sess., 11378; and "Title III" of H.R. 3147, 86th Cong., 2d Sess., deleted by the House Judiciary Committee. H.R.Report No. 956, in 1 U.S.Code Cong. & Adm.News 1960, p. 79.

would have authorized the Attorney General to file desegregation suits expressly recognized the right of the United States to intervene in such litigation to preserve the integrity of its courts.[12] Despite the rejection of "Part III," that inherent right would remain. Invoking this reserved power, the Attorney General intervened in the Faubus case to protect the judicial process. Yet, in considering the Civil Rights Act of 1960, though fully aware of the Little Rock precedent, Congress did nothing to withdraw from the United States its right to intervene in similar cases. Apparently it preferred this method of enforcing court orders to the use of troops.

■■ Nor is there merit to the argument that, because the United States is styled an "amicus curiae," it cannot ask for affirmative relief. It is true that ordinarily an amicus curiae merely tenders a brief advising the court on the law applicable to the case. But, as shown, in these proceedings the United States is no ordinary amicus. Whether "amicus curiae" is the proper title is a quibble over labels. However, we think it singularly appropriate here, since the role

of the United States in this proceeding is more truly that of a friend of the court than is often the case with so-called "amici," who are rather friends of one party or the other. Nor is this designation under like circumstances without precedent. Faubus v. United States, supra; A. B. Dick Co. v. Marr, 2 Cir., 197 F.2d 498; Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 514; Helmbright v. John A. Gebelein, Inc., D.C.D.Md., 19 F.Supp. 621.

The real objection is to the participation of the United States in any guise, whether as party plaintiff, intervenor, or amicus. It is said that the government has no "interest." Of course, it has no proprietary or financial interest to protect.[13] And, in view of the history of the recent Civil Rights Acts, perhaps it cannot voice its obvious interest in securing for all citizens the enjoyment of constitutional rights.[14] But that does not mean that the Justice Department of the United States can have nothing to do with the administration of justice or that it must remain indifferent when the judgments of federal courts are sought to be subverted by state action. The interest

12. In the debate in the Senate, opponents of the bill pointed out that Section 121 of Part III would permit the Attorney General to bring an action at government expense to enforce an individual's rights whether or not that person wished the Attorney General to bring such an action (Sen. Russell, 103 Cong.Rec. 9711–2; Sen. Hill, 103 id. 10230; Sen. Ervin, 103 id. 10087, 10090, 10233; Sen. Thurmond, 103 id. 10239; Sen. Ellender, 103 id. 10454–5; Sen. McClellan, 103 id. 10468; Sen. Byrd, 103 id. 10673; see also, Sen. Carroll, 103 id. 10090). But they recognized the distinction between the government's bringing an action to enforce a private individual's civil rights and the inherent right of a government "to use necessary power [specifically, the injunctive process] for self-protection" (Sen. Hill, 103 id. 10227; see also, Sen. Ellender, 103 id. 10454). Senator Stennis pointed out that injunction proceedings to prevent obstructions to federal court orders, as illustrated by the Kasper contempt case (see Kasper v. Brittain, 6 Cir., 245 F.2d 92), were not the kind of proceedings to

which the opponents of Section 121 had reference, "and it is most important that this difference be emphasized" (103 id. 10073). Senators Kefauver and Cooper likewise distinguished the Kasper case (103 id. 10823, 10918).

13. Needless to say, lack of financial interest does not disqualify the United States as a party plaintiff. In re Debs, 158 U.S. 564, 583–587, 15 S.Ct. 900, 39 L.Ed. 1092.

14. There is some doubt whether the mere failure of Congress to expressly authorize the Attorney General to prosecute desegregation suits strips him of that power, if the United States has an interest in the matter. See United States v. State of California, 332 U.S. 19, 28, 67 S.Ct. 1658, 1663, 91 L.Ed. 1889, in which the Supreme Court rejected a similar argument, saying: "That Congress twice failed to grant the Attorney General specific authority to file suit against California, is not a sufficient basis upon which to rest a restriction of the Attorney General's statutory authority."

of the government here is the same as that which justifies its prosecution for obstruction of court orders in violation of 18 U.S.C. § 1509, or for contempt of those orders under 18 U.S.C. § 401. Admittedly, the Attorney General can act on behalf of the United States courts in those instances. Why should he not be permitted to come in here to accomplish the same purpose by different, less radical means? The absence of specific statutory authority is of itself no obstacle, for it is well settled that there is no such prerequisite to the appearance of the United States before its own courts. United States v. San Jacinto Tin Co., 125 U.S. 273, 278–285, 8 S.Ct. 850, 31 L.Ed. 747; Kern River Co. v. United States, 257 U.S. 147, 155, 42 S.Ct. 60, 66 L.Ed. 175; Sanitary Dist. of Chicago v. United States, 266 U.S. 405, 426, 45 S.Ct. 176, 69 L.Ed. 352. Nor do the statutes governing the Attorney General's participation in court proceedings contain a prohibition. See 5 U.S.C.A. §§ 309, 316. On the contrary, the amendment to Section 1509 of Title 18, added by the Civil Rights Act of 1960, expressly permits the United States to seek *preventive relief*

even though a crime may already have occurred.

The same considerations govern from the court's point of view. No one doubts that federal courts may call on the Justice Department to enforce their decrees by resort to arms if necessary. In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55. Nor is it disputed that they can direct the United States Attorney to prosecute contempts of their authority. F.R.Cr.P., Rule 42, 18 U.S.C. But must they resort to such extreme measures to obtain the aid of the executive branch in the implementation of their judgments? All reason rejects that absurd result. And nothing opposes the more temperate course followed here.[15] Indeed, the Supreme Court has said: "After all, a federal court can always call on law officers of the United States to serve as *amici*." Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 581, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447.[16]

We conclude that the participation of the United States at this stage of the proceeding is entirely appropriate. We invited the United States to enter the case in an effort to find a peaceful solu-

15. Compare In re Debs, supra, 158 U.S. at page 583, 15 S.Ct. at page 906: "So, in the case before us, the right to use force does not exclude the right of appeal to the courts for a judicial determination and for the exercise of all their powers of prevention. Indeed, it is more to the praise than to the blame of the government, that, instead of determining for itself questions of right and wrong on the part of these petitioners and their associates and enforcing that determination by the club of the policeman and the bayonet of the soldier, it submitted all those questions to the peaceful determination of judicial tribunals, and invoked their consideration and judgment as to the measure of its rights and powers and the correlative obligations of those against whom it made complaint. * * *"

16. Undoubtedly, the court might have itself provoked a hearing and issued the injunctions sua sponte in order to effectuate its judgments. 28 U.S.C. § 1651. See Hazel-Atlas Glass Co. v.

Hartford-Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250: "Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims * * *" But the court should not be compelled to be its own attorney. It is entitled to seek out a friend to protect its integrity, and, as the Court of Appeals said in Faubus, supra, 254 F.2d at page 805, "the court could not, with propriety, employ private counsel to do the necessary investigative and legal work."

We note that defendants, in support of their argument that the United States is an unnecessary party, say nothing of the court's right to act on its own motion. This is obviously because the proposition cuts both ways. Indeed, if the court may grant these applications sua sponte, nothing is accomplished by eliminating the government as the moving party.

tion to the problem created by the state's interference with the orders of the court. To do otherwise was to risk anarchy. Through this procedure, we sought to keep the conflict in the courts. Thus the rule of law was preferred to the law of the jungle. Why the defendants depreciate this choice is difficult to understand. Certainly they were not fatuous enough to hope that the United States would stand idly by and watch the orders of its courts flouted, particularly in this sensitive area of constitutional rights.

█ On these findings temporary injunctions will issue restraining the enforcement of Act 5 of the Second Extraordinary Session of the Louisiana Legislature for 1960 and Act 4 and Senate Concurrent Resolution 7 of the Third Extraordinary Session. For the present, however, there appears no compelling reason to direct the Secretary of State to certify the re-election of Mr. Sutherland, since all parties agree that he retains his membership in the Orleans Parish School Board as a hold-over regardless of the recent election. At this time, therefore, the application for a mandatory injunction will be denied, reserving to the United States or any other interested party the right to re-urge it should Mr. Sutherland's title to office be threatened.

Judgment accordingly.

### Temporary Injunction

This case came on for hearing on motions of the United States, amicus curiae, for temporary injunction, restraining the enforcement of Act 5 of the Second Extraordinary Session of the Louisiana Legislature for 1960, and Act 4 and Senate Concurrent Resolution 7 of the Third Extraordinary Session of the Louisiana Legislature for 1960.

It being the opinion of this court that all Louisiana statutes which would directly or indirectly require segregation of the races in the public schools, or deny them public funds because they are desegregated, or interfere with the operation of such schools, pursuant to the orders of this court, by the duly elected Orleans Parish School Board, are unconstitutional, in particular, the aforesaid Act 5, Act 4, and Senate Concurrent Resolution 7;

It Is Ordered that the Honorable Jimmie H. Davis, Governor of Louisiana, the Honorable Clarence C. Aycock, Lieutenant Governor of Louisiana, the Honorable Jack P. F. Gremillion, Attorney General of the State of Louisiana, the Legislature of the State of Louisiana and the individual members thereof, Shelby M. Jackson, State Superintendent of Education, the Orleans Parish School Board, Lloyd J. Rittiner, Louis C. Riecke, Matthew R. Sutherland, Theodore H. Shepherd, Jr. and Emile A. Wagner, Jr., the members thereof, James F. Redmond, Superintendent of Schools for the Orleans Parish School Board, A. P. Tugwell, Treasurer of the State of Louisiana, Roy R. Theriot, State Comptroller, the Louisiana State Board of Education and the individual members thereof, Paul B. Habans, Gerald J. Gallinghouse, David B. Gertler, Edward F. LeBreton, Charles Deichmann, Ridgley C. Triche, P. P. Branton, Welborn Jack, Vial Deloney, William Cleveland, E. W. Gravolet, F. Otway Denny, Edward J. Penedo, and John Singreen, their successors, agents, and representatives, and all other persons who are acting or may act in concert with them, be, and they are hereby, restrained, enjoined and prohibited from enforcing or seeking to enforce by any means the provisions of Act 5 of the Second Extraordinary Session of the Louisiana Legislature for 1960, and Act 4 and Senate Concurrent Resolution 7 of the Third Extraordinary Session of the Louisiana Legislature for 1960, and from otherwise interfering in any way with the operation of the public schools for the Parish of Orleans by the duly elected Orleans Parish School Board, pursuant to the orders of this court.

It is further ordered that copies of this temporary injunction shall be served forthwith upon each of the defendants named herein.

It is further ordered that copies of this temporary injunction shall be served

forthwith on the Louisiana Sovereignty Commission, through its chairman, and on the Joint Legislative Committee on Un-American Activities of the Louisiana Legislature, through its chairman.

Inasmuch as this temporary injunction is issued on the motions of the United States, no bond is required. 28 U.S.C. § 2408.