Sadie L. COHEN et al., Plaintiffs,

v.

Thomas C. MALONEY, Mayor of the City of Wilmington, et al., Defendants.

Civ. A. No. 4736.

United States District Court,
D. Delaware.

March 21, 1977.

G. Thomas Sandbach, Wilmington, Del., for plaintiffs.

Robert D. Goldberg, Asst. City Sol., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

The plaintiffs in this case have demonstrated at trial that a reapportionment ordinance of the City of Wilmington violated the Equal Protection Clause of the United States Constitution. See Cohen, et al. v. Maloney, et al., 410 F.Supp. 1147 (D.Del. 1976). They now seek an award of attorney's fees against some of the individual defendants pursuant to 42 U.S.C. § 1973*l* (e):

> (e) In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Plaintiffs' amended complaint names as defendants the Mayor of the City of Wilmington, the members of the City Council, the members of the New Castle County Board of Elections and the State Elections Commissioner. The State Elections Commissioner and the New Castle County Board of Elections are charged under state law with the responsibility for supervising and conducting elections in New Castle County, including those involving Wilmington City Council seats. The relief sought in the amended complaint was (1) a declaratory judgment that the reapportionment ordinance was unconstitutional, (2) an injunction restraining "the named defendants" from conducting an election in accordance with the provisions of the ordinance, and (3) an injunction restraining the thirteen councilmen who allegedly voted for the ordinance "from approving any ordinance purporting to transfer one or more election districts from one existing councilmanic district to another for other than constitutional reasons". The Court has heretofore entered a judgment declaring the ordinance unconstitutional and restraining the defendants "from conducting an election utilizing the councilmanic districts prescribed in" the unconstitutional ordinance.[1]

Plaintiffs do not seek counsel fees from the officials responsible for the conduct of elections. They point out that these individuals were joined in "their official capacity" in order to enforce the decision of the Court and note that these individuals did not actively participate in the defense of the case. Each responded to the complaint, asked to be relieved from active participation in the litigation of the merits, and agreed to abide by whatever decision the Court might make. Plaintiffs do, however, seek counsel fees from the Mayor and the members of the City Council whom plaintiffs maintain were responsible for passage of the ordinance.[2] These defendants, represented by the City Solicitor's Office, did actively defend against plaintiffs' claim.

In response to this request for counsel fees, the Mayor and defendant councilmen claim, for the first time, that they are protected by legislative immunity. Relying primarily on Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), they assert that Congress in adopting Section 1973*l*(e) did not intend to abrogate legislative immunity, and argue that legislators, in considering reapportionment legislation,

---

1. As hereafter noted, the defense of legislative immunity had not been raised at the time of the entry of this order and defense counsel did not object to the inclusion of all defendants within the scope of the injunction.

2. Two councilmen, Bartkowski and DiPinto, are alleged in the complaint to have taken no "part in the malapportionment scheme" and were joined "in their official capacity only".

must not be inhibited by fear of incurring personal liability for damages or attorney's fees. Plaintiffs, on the other hand, contend that Section 1973*l*(e) was intended to override legislative immunity, as far as counsel fees are concerned, in much the same manner as Title VII of the Civil Rights Act has been held to override Eleventh Amendment immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614, 44 U.S. L.W. 5120 (1976).

▮ While my analysis differs somewhat from that of the defendants, I agree that Section 1973*l*(e) is not designed to abrogate legislative immunity and that Congress did not intend to impose personal counsel fee liability on legislators as a matter of course for having adopted an ordinance subsequently found to be unconstitutional. Nevertheless, I conclude that Section 1973*l* (e) authorizes an award against defendants serving in a legislative capacity who voluntarily elect to defend a case of this kind and thereby occasion an expenditure of counsel fees by the plaintiffs which cannot equitably be reimbursed from any other source.

▮ The arguments of the parties in this case overlook the fact that legislative immunity is an *immunity from suit*. This is important when examining a claim that a counsel fee statute has abrogated this immunity, for the simple reason that, in any case where it has application, legislators will not be parties defendant when the award of attorney's fees becomes an issue. In *Tenney v. Brandhove, supra*, the Supreme Court explained the rationale behind the doctrine of legislative immunity:

. . . Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and dis-

tractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. . . .

Later in *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed. 577 (1967) the Supreme Court expressly noted that legislative immunity was an immunity from suit:

. . . It is the purpose and office of the doctrine of legislative immunity, having its roots as it does in the Speech and Debate Clause of the Constitution, *Kilbourn v. Thompson*, 103 U.S. 168, 204, 26 L.Ed. 377 (1881), that legislators engaged "in the sphere of legitimate legislative activity," *Tenney v. Brandhove, supra*, 341 U.S., at 376, [71 S.Ct. 783] should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.

. . . . .

▮ Nor is the function of the doctrine of legislative immunity limited to a foreclosure of suits for damages. In order to serve its purpose, it must, where applicable, bar suits for equitable relief as well. In *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), for example, the Supreme Court held legislative immunity to be a bar to a suit asking for injunctive relief against the members of a congressional committee.

▮ It is equally clear, however, that legislative immunity is not applicable to all suits against those who serve as legislators. First of all, it is applicable only where the activities or threatened activities giving rise to the suit are legitimate legislative activities. *Doe v. McMillan, supra*. There is no protection when the activities involved extend beyond the legislative sphere. Thus, legislators, for example, may "frequently be in touch with and seek to influence the Executive Branch of Government, but this conduct 'though generally done, is not protected legislative activity.'" *Doe v. McMillan*, 412 U.S. at 313, 93 S.Ct. at 2025.[3]

---

3. In *Shellburne, Inc. v. New Castle County*, 293 F.Supp. 237 (D.Del.1968) this Court, while dismissing a claim against members of a county council for damages arising from the passage of a zoning ordinance, refused to dismiss a

claim for injunctive relief against them and others. The injunctive relief sought was not in the form of a restraint against further legislative activity but rather against interference with the issuance of building permits.

■ The second important limitation on the applicability of legislative immunity is a pragmatic one arising from the necessity for judicial review of the results of legislative action. In all except the rare case, legislative action causes no injury to constitutional rights absent a threat of enforcement by an agent of the governmental unit involved. For many years it has been established that the *execution* of unconstitutional legislative action may be enjoined in a suit against the enforcing agent or agents. *E. g., Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1881). This involves no conflict with the policy behind legislative immunity since the "purpose of the protection afforded legislators is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions." *Powell v. McCormick,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In a small number of cases, however, the courts have been faced with the reality that constitutional rights cannot always be protected absent restraint on legislative activities. Thus the Supreme Court has been careful not to suggest that legislative immunity would bar a suit against legislators "where no agents participated in the challenged action and no other remedy was available." *Powell v. McCormick,* 395 U.S. at 506, fn. 26, 89 S.Ct. at 1956. See also *Kilbourn v. Thompson,* 103 U.S. 168, 204–5, 26 L.Ed. 377 (1881).

Into this category of extraordinary case, fall the few integration cases in which federal courts have enjoined legislators from legislative activity. *E. g., Jordan v. Hutcheson,* 323 F.2d 597 (4th Cir. 1963); *Bush v. Orleans Parish School Board,* 191 F.Supp. 871 (E.D.Pa.1961), *aff'd. per cu-*

*riam, Denny v. Bush,* 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961). In the *Bush* case, the court had earlier directed school board officials to formulate and implement a plan of desegregation. The board had attempted to comply but was frustrated in its efforts by a comprehensive plan of harassment mounted by the Louisiana Legislature, including an effort to remove the school board members and replace them with a new group appointed by the legislature. The court held that where relief against the state's implementing agents is rendered ineffectual by legislative action, legislative immunity must yield.

■ Applying these principles, I think it apparent that the Mayor [4] and the members of the City Council, if they had so requested, would have been entitled to have the complaint dismissed as to them. The complaint requested an injunction against further unconstitutional legislative action without alleging any extraordinary circumstances indicating that injunctive or declaratory relief against the election officials would be ineffective. In this respect the case would appear to be a paradigm case for application of the doctrine of legislative immunity. It is, of course, true that the plaintiffs asked this Court to enjoin all the defendants from conducting any election under the ordinance, but they failed to allege that these defendants had any authority with respect to the implementation of the ordinance or that there had been any acts or threats on their part which would interfere with the election officials in the execution of their duties.

The conclusion that this would have been an appropriate case for application of the doctrine of legislative immunity does not end the matter, however. These defendants chose to appear and to defend against plaintiffs' prayer for relief from the unconstitutional ordinance. As a result, plain-

---

4. Under the City Charter and the applicable state statutes, the Mayor of Wilmington has no responsibility in connection with the conduct of elections, the canvassing of votes, or the certification of election results. The only legally relevant allegations of the complaint concerning Mayor Maloney relate to his alleged support of Ordinance 73–074. The trial evidence with respect to him indicated only that he signed this Ordinance after its passage by Council. While counsel have cited no authorities on the question, I believe these kinds of activities are protected by legislative immunity or its equivalent.

tiffs have been required to spend substantial amounts in counsel fees. Assuming that plaintiffs otherwise fall in the category of plaintiffs whom Section 1973*l*(e) was intended to aid, the question is, accordingly, posed whether the congressional intent should be frustrated by the assertion of legislative immunity at this stage of the proceedings.

While it is impossible to be certain what would have occurred if the defendants here sought to be charged with counsel fees had not undertaken the defense of this action, it is apparent that the remaining defendants, as a practical matter, would have had three alternatives: (1) evaluate plaintiffs' claim in light of their obligations under state law and the United States Constitution and consent to judgment if they concluded that claim was meritorious, (2) evaluate plaintiffs' claim and proceed to defend if they concluded it was without merit, or (3) refer the matter to the City Solicitor's Office and insist upon intervention by the City or an indemnification agreement as a condition of their defense on the merits.[5] If any of these three alternatives had been chosen plaintiffs would not have been left with the counsel fee burden from which they now seek relief. If the first alternative had been elected, plaintiff's burden would have been inconsequential. If either of the others had been elected and the Court had ultimately determined that the case was an appropriate one for a counsel fee award, it would have been fair to look to the County Board of Elections or the State Elections Commissioner. Given the manner in which the case, in fact, developed, however, all parties acknowledge that an award against these defendants would be inequitable.

Given this background, I hold that the defendants who elected to defend this action are estopped by their election from asserting a defense of legislative immunity.[6] Accordingly, I turn to the question of whether plaintiffs come within the class which Congress intended to aid when it adopted Section 1973*l*(e).

Defendants assert that the statute is not applicable to the plaintiffs in this suit because the purpose behind the statute was to "encourage individuals injured by unconstitutional denials of equal protection to seek judicial relief" and here plaintiffs brought suit prior to enactment of 42 U.S.C. § 1973*l* (e).[7] Since plaintiffs did not rely on the statute in initiating their suit, defendants argue, they should not be permitted to recover under its provisions.

■ I do not accept this argument. A court should apply the law existing at the time of its decision unless there is statutory direction or legislative history to the contrary or unless it is necessary to do otherwise in order to avoid manifest injustice. *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). I have not found, nor have the parties directed me to, any legislative history suggesting that Section 1973*l*(e) was not intended to apply to actions pending at the time the statute was passed. Instead, I find strong

---

**5.** The role played in this case by the City Solicitor's Office may indicate that the City assumed the defense of this case on behalf of the City defendants and has undertaken to indemnify them with respect to any award of counsel fees. While the absence of the City as a formal party has eliminated it as a direct source of reimbursement to plaintiffs, Congress apparently did contemplate that the governmental units involved in voting rights cases might undertake indemnification of this kind. The Senate Report, for example, contains the following observation:

> . . . [D]efendants in these cases are frequently state or local bodies or state or local officials. In such cases it is intended that the attorneys fees . . . will be collected ei-

ther from the official directly, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party). Senate Report No. 94–295, 2 U.S.Code Cong. & Admin.News, 94th Cong., 1st Sess., 1975, p. 774, at p. 808.

**6.** This case is analogous to *Sims v. Amos,* 340 F.Supp. 691 (M.D.Ala.) *aff'd.,* 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed. 215 (1972) in which members of the Alabama Legislature voluntarily intervened (340 F.Supp. at 693, n. 4) and were ultimately charged with plaintiffs' counsel fees.

**7.** Plaintiffs brought suit on October 4, 1973. Section 1973*l*(e) became effective on August 6, 1975.

evidence that application to pending cases was contemplated.

■ Section 1973*l*(e) appears to have been enacted in response to the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) which disapproved counsel fee awards under the so-called "private attorney general" theory and required that congressional intent to authorize such awards be clearly articulated.[8] The legislative history suggests that Section 1973*l*(e) was intended to reaffirm a pre-existing congressional intent that attorney's fees would be awarded in actions of this kind, as an integral part of the remedies necessary to enable private citizens to vindicate their fundamental rights. Senate Report No. 94–295, 2 U.S.Code Cong. & Admin.News, 94th Cong. 1st Sess., 1975, at pp. 806–10. Against this background, it is appropriate to include within the scope of that Section cases filed before *Alyeska* and concluded after the passage of the responsive legislation.

Moreover, I find no manifest injustice to defendants in awarding attorney's fees here. This is not a typical lawsuit between private individuals, but rather one where plaintiffs, acting in the public interest as well as their own, sought to compel defendant public officials to comply with the constitutional mandate to ensure citizens equal voting power. Proofs at trial showed that enforcement of the ordinance would have resulted in a substantial deviation—18.3%—from the ideal distribution of the franchise and that the justifications offered by defendants for this deviation simply did not coincide with the historic facts surrounding the past selection of City apportionment plans and of Ordinance 73–074, in particular.

Nor is this a case where the Court has imposed new substantive duties on defendants of which they had no prior notice. See *Bradley v. Richmond School Board, supra.*

The obligation to protect individual citizens' voting rights clearly existed long before the events giving rise to this lawsuit.

Having concluded that plaintiffs are entitled to consideration of their request according to the standards established by Section 1973*l*(e), I turn to the application of that statute. The Senate Report on the Voting Rights Act Extension of 1975 contains the following cogent comment regarding the congressional intent reflected in what ultimately became Section 1973*l*(e):

It is intended that the standards for awarding fees under sections 402 and 403 be generally the same as under the fee provisions of the 1964 Civil Rights Act. A party seeking to enforce the rights protected by the Constitutional clause or statute under which fees are authorized by these sections, if successful, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises, Inc.,* 88 S.Ct. 964, 390 U.S. 400, 402, 19 L.Ed.2d 1263 (1968).

2 U.S.Code Cong. & Admin.News. p. 807. I find no special circumstances in this case which militate against an award of counsel fees and, accordingly, hold that Section 1973*l*(e) authorizes such an award.

■ Turning to the proper amount of an award, the parties have stipulated that plaintiffs' counsel devoted 293 hours (in the various categories set forth in his affidavit) and I accept counsel's testimony that his normal hourly rate for services of these kinds was $50.00. In addition, approximately 9 hours were spent in research by two members of counsel's supporting staff and the parties have stipulated that the appropriate rate for these services is $25.00 per hour. I further find that plaintiffs' counsel pursued his clients' claims in a reasonable manner and with a high degree of professional skill. Following the *Lindy Brothers*[9] approach, I have started out with an hours times rate figure of $14,875.00. I

---

8. The *Alyeska* case was decided on May 12, 1975. As heretofore noted, Section 1973*l*(e) became effective on August 6, 1975.

9. *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3rd Cir. 1973).

have considered whether there are any other factors which should cause this figure to be either increased or decreased, but have concluded that no factors of this kind exist in this case.

I deny plaintiffs' application, however, for an award of counsel fees for time spent by counsel in pursuing the fee application. *Dillon v. Berg*, Civil Action No. 3967, D.Del. Unreported Opinion August 25, 1975, *aff'd.* 538 F.2d 318 (June 14, 1976); *Chromalloy American Corporation v. Alloy Surfaces Co., Inc.*, 353 F.Supp. 429, 432 (D.Del.1972).

Submit order.