**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Edgar H. GILLOCK, Defendant-Appellee.**

**No. 77–5335.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1978.

Decided Nov. 1, 1978.

Rehearing and Rehearing En Banc
Denied Jan. 17, 1979.

W. J. Michael Cody, U. S. Atty., Glen Reid, Jr., Asst. U. S. Atty., Memphis, Tenn., for plaintiff-appellant.

James V. Doramus, James F. Neal, Neal & Harwell, Nashville, Tenn., Hal Gerber, Gerber, Bernstein, Gerber & Winestone, James D. Causey, Memphis, Tenn., for defendant-appellee.

Before WEICK, EDWARDS and ENGEL, Circuit Judges.

EDWARDS, Circuit Judge.

The question posed by this case is whether a federally indicted Tennessee State Senator is entitled to the protection of a common law speech or debate privilege as to his legislative acts. The issue requires an examination of a good deal of ancient history.

In 1689, after nearly two centuries of struggle between the English monarchy and the English Parliament, the English Bill of Rights was wrung by Parliament from newly crowned monarchs. It declared "that the

Freedom of Speech and Debate or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament."[1] It was the Constitution of the United States by adoption of the Bill of Rights in 1789 which first provided an enforceable guarantee of freedom of speech for all persons. But previously in 1787 the original Constitution (and the Articles of Confederation before it[2]) had enacted freedom of speech rights for members of Congress in the discharge of their official duties. Article I, § 6 of the United States Constitution provided (and provides) "any Speech or Debate in either House . . . shall not be questioned in any other Place."

Three states in 1787 had already adopted similar protections for their legislators. By now 43 states, including Tennessee, provide such constitutional protection for the legislative process. The working of the Tennessee Constitutional guarantee is:

> **Privilege of members.**—Senators and Representatives shall, in all cases, except treason, felony, or breach of the peace, be privileged from arrest during the session of the General Assembly, and in going to and returning from the same; and for any speech or debate in either House, they shall not be questioned in any other place.

Tenn.Const. art. II, § 13.

All parties to this litigation concede, however, that neither provision quoted above from either the United States or the Tennessee Constitutions is directly applicable to the instant prosecution. This indictment is laid under a federal statute which prohibits "extortion . . . under color of official right." Hobbs Act, 18 U.S.C. § 1951 (1976).[3] The Tennessee Constitution cannot provide any specific protection to this state legislator in this case because of the supremacy clause in the federal constitution, art. VI, clause 2. Of course, the

---

1. 1 W. & M., Sess. 2, c. 2.

2. Article V of the Articles of Confederation provided:

"freedom of speech and debate in Congress shall not be impeached or questioned in any court, or place out of Congress. . . ."

3. Other counts charged Gillock with violating 18 U.S.C. §§ 1952 and 1962 (1976).

United States Constitution's provision does not apply directly, since appellee is not a member of either house of the United States Congress.

The question which remains is whether a federal common law privilege for state legislators essentially equivalent to the provisions contained in the English Bill of Rights and the United States and Tennessee Constitutions should be recognized by the federal courts in admitting evidence in a Hobbs Act case. If so, there is a second and less important question pertaining to the scope of the privilege to be applied in this case.

## THE FACTS

The seven-count indictment against Tennessee State Senator Edgar H. Gillock charged him with 1) procuring and agreeing to accept a bribe "under color of official right" for using his official office to prevent the extradition of one James Williams from Tennessee to Illinois; 2) attempting to obtain $5,000 apiece from four named individuals for using his office to attempt to procure for them master electrician's licenses; and 3) being engaged in the racketeering enterprises referred to, in violation of TCA § 39–802 which prohibits a member of the Tennessee legislature from agreeing to accept anything of value for exercising the discretion of the public office which he holds.

This case has been the subject of numerous motions and proceedings in the United States District Court for the Western District of Tennessee. In those proceedings defendant Gillock moved to dismiss the indictment and to suppress all the evidence concerning his legislative activities. The District Court denied motions to dismiss the indictment, but granted motions to exclude much of the evidence, holding that, as state senator, defendant Gillock had an evidentiary speech or debate privilege under Rule 501 of the Federal Rules of Evidence.

The government then appealed to this court under 18 U.S.C. § 3731 (1976), and this court remanded for the writing of a more particularized record of the evidence to be dealt with. In the District Court the government filed a detailed offer of proof which we have reproduced as an Appendix to this opinion. The District Judge then made detailed rulings thereon, and on the same grounds, suppressed many items in the offer of proof. The government then brought the instant appeal under 18 U.S.C. § 3731 (1976).

## THE PRIVILEGE

■ The basic question, as the District Judge recognized, is whether or not defendant Gillock is entitled to a common-law speech or debate privilege. Although the question has divided the Circuit Courts and has never been passed on by the Supreme Court, we hold that he is so entitled, albeit we would describe its limits somewhat more narrowly than did the District Judge.

The long history of the legislative speech or debate clauses which we have described at the beginning of this opinion forms the background of our decision. The government's brief seems to suggest that there is no need for such protection of legislative branches of government (whether national or state) when the powers of government are divided (as in the United States and Tennessee Constitutions) between three co-equal bodies—the Executive, the Legislative and the Judiciary. This argument would have more appeal if American history demonstrated that no national or state executive had ever reached for power so as to infringe upon the rights of a legislative branch. From the beginning of the history of the United States to very recent years, however, there have been recurrent conflicts over power which have brought the President and Congress (to say nothing of Governors and Legislatures) into grave conflict. It is easy to conceive of the abuse of federal prosecutorial power against members of state legislatures of an opposite political persuasion.

The problem of this case is not constitutional immunity. No constitutional protection applies to defendant Gillock in this federal prosecution. What is at issue is his

claim, upheld by the District Judge, that evidence concerning his legislative acts should be suppressed because they are protected by a common-law privilege.

Chief Judge Bailey Brown who conducted the hearings and entered the suppression order from which this appeal is taken reasoned as follows:

We conclude that, under Rule 501 of the Rules of Evidence, defendant has a speech or debate privilege with respect to, but only with respect to, his legislative acts and motivation therefor because we believe that such is required, as stated in the Rule, "by the principles of the common law" as they are interpreted "in the light of reason and experience." The reasons for the conclusion are these. The privilege is necessary, to paraphrase Chief Justice Burger in the *Brewster* case, to protect the integrity of the legislative process by insuring the independence of individual legislators, not simply for the personal or private benefit of legislators. To the extent that venal legislators might go unconvicted because of the government's being barred from proving legislative acts and motives, this is the price that the Founding Fathers believed we have to pay for legislative independence. Such freedom of our state legislators from federal criminal prosecutions, which call into question their legislative acts and motives, is necessary to preserve the constitutional relation between our federal and state governments in our federal system.

We believe that under the historical background we have recited above, Rule 501 of the Federal Rules of Evidence authorized Judge Brown (and authorizes and requires us) to find and protect a speech or debate privilege. Rule 501 provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

We have indicated above that lessons "of reason and experience" have motivated recognition of legislative speech or debate immunity or privilege in 43 of the 50 states and in the English Bill of Rights, the Articles of Confederation of the United States, as well as the United States Constitution.

While the United States Supreme Court has never passed upon the precise problem which we face, it has recognized the immunity from civil suit of a state legislator on reasoning which we think applicable to this case:

The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries. As Parliament achieved increasing independence from the Crown, its statement of the privilege grew stronger. In 1523, Sir Thomas More could make only a tentative claim. Roper, Life of Sir Thomas More, in More's Utopia (Adams ed.) 10. In 1668, after a long and bitter struggle, Parliament finally laid the ghost of Charles I, who had prosecuted Sir John Elliot and others for "seditious" speeches in Parliament. Proceedings against Sir John Elliot, 3 How.St.Tr., 294, 332. In 1689, the Bill of Rights declared in unequivocal language: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 Wm. & Mary, Sess. 2, c. II. See *Stockdale v. Hansard,* 9 Ad. & El. 1, 113–114 (1839).

Freedom of speech and action in the legislature was taken as a matter of course by those who severed the Colonies

from the Crown and founded our Nation. It was deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution. Article V of the Articles of Confederation is quite close to the English Bill of Rights: "Freedom of speech and debate in Congress shall not be impeached or questioned in any court or place out of Congress . . . ." Article I, § 6, of the Constitution provides: " . . . for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place."

The reason for the privilege is clear. It was well summarized by James Wilson, an influential member of the Committee of Detail which was responsible for the provision in the Federal Constitution. "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence." II Works of James Wilson (Andrews ed. 1896) 38. See the statement of the reason for the privilege in the Report from the Select Committee on the Official Secrets Acts (House of Commons, 1939) xiv.

Tenney v. Brandhove, 341 U.S. 367, 372–73, 71 S.Ct. 783, 786, 95 L.Ed. 1019 (1951).

In the fundamental case dealing with the protection granted by the United States Constitution's provision for protection of speech or debate, the Supreme Court, through Chief Justice Burger said:

The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators. The genesis of the Clause at common law is well known. In his opinion for the Court in United States v. Johnson, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), Mr. Justice

Harlan canvassed the history of the Clause and concluded that it

"was the culmination of a long struggle for parliamentary supremacy. Behind these simple phrases lies a history of conflict between the Commons and the Tudor and Stuart monarchs during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators. Since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature." Id., at 178, 86 S.Ct. at 754 (footnote omitted).

Although the Speech or Debate Clause's historic roots are in English history, it must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government rather than the English parliamentary system. We should bear in mind that the English system differs from ours in that their Parliament is the supreme authority, not a coordinate branch. Our speech or debate privilege was designed to preserve legislative independence, not supremacy. Our task, therefore, is to apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government.

It does not undermine the validity of the Framers' concern for the independence of the Legislative Branch to acknowledge that our history does not reflect a catalogue of abuses at the hands of the Executive that gave rise to the privilege in England. There is nothing in our history, for example, comparable to the imprisonment of a Member of Parliament in the Tower without a hearing and, owing to the subservience of some royal judges to the 17th and 18th century English kings, without meaningful recourse to a writ of habeas corpus. In fact, on only one previous occasion has this Court ever interpreted the Speech or Debate

Clause in the context of a criminal charge against a Member of Congress.

(a) In *United States v. Johnson, supra,* the Court reviewed the conviction of a former Representative on seven counts of violating the federal conflict-of-interest statute, 18 U.S.C. § 281 (1964 ed.), and on one count of conspiracy to defraud the United States, 18 U.S.C. § 371. The Court of Appeals had set aside the conviction on the count for conspiracy to defraud as violating the Speech or Debate Clause. Mr. Justice Harlan, speaking for the Court, 383 U.S., at 183, 86 S.Ct. at 757, cited the oft-quoted passage of Mr. Justice Lush in *Ex parte Wason,* L. R. 4 Q. B. 573 (1869):

> "I am clearly of the opinion that we ought not to allow it to be doubted for a moment that the motives or intentions of members of either House cannot be inquired into by criminal proceedings *with respect to anything they may do or say in the House." Id.,* at 577 (emphasis added).

In *Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1881), the first case in which this Court interpreted the Speech or Debate Clause, the Court expressed a similar view of the ambit of the American privilege. There the Court said the Clause is to be read broadly to include anything "generally done in a session of the House by one of its members in relation to the business before it." *Id.,* at 204. This statement, too, was cited with approval in *Johnson,* 383 U.S., at 179, 86 S.Ct. at 755. Our conclusion in *Johnson* was that the privilege protected Members from inquiry into legislative acts or the motivation for actual performance of legislative acts. *Id.,* at 185, 86 S.Ct. at 758.

In applying the Speech or Debate Clause, the Court focused on the specific facts of the *Johnson* prosecution. The conspiracy-to-defraud count alleged an agreement among Representative Johnson and three codefendants to obtain the dismissal of pending indictments against officials of savings and loan institutions. For these services, which included a speech made by Johnson on the House floor, the Government claimed Johnson was paid a bribe. At the trial, the Government questioned Johnson extensively, relative to the conspiracy-to-defraud count, concerning the authorship of the speech, the factual basis for certain statements made in the speech, and his motives for giving the speech. The Court held that the use of evidence of a speech to support a count under a broad conspiracy statute was prohibited by the Speech or Debate Clause. The Government was, therefore, precluded from prosecuting the conspiracy count on retrial, insofar as it depended on inquiries into speeches made in the House.

*United States v. Brewster,* 408 U.S. 501, 507–10, 92 S.Ct. 2531, 2536, 33 L.Ed.2d 507 (1971). (Footnotes omitted.)

In *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1965), Justice Harlan said for the Court:

> In *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019, at issue was whether legislative privilege protected a member of the California Legislature against a suit brought under the Civil Rights statute, 8 U.S.C. §§ 43, 47(3) (1946 ed.), alleging that the legislator had used his official forum "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights of free speech and to petition the Legislature for redress of grievances . . . ." 341 U.S., at 371, 71 S.Ct. at 785. The Court held a dismissal of the suit proper; it viewed the state legislative privilege as being on a parity with the similar federal privilege, and concluded that
>
> > "The claim of an unworthy purpose does not destroy the privilege . . . . The holding of this Court in *Flecher v. Peck,* 6 Cranch. 87, 130, 3 L.Ed. 162, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned." 341 U.S., at 377, 71 S.Ct. at 788.

## III.

*Kilbourn* and *Tenney* indicate that the legislative privilege will be read broadly to effectuate its purposes; neither case deals, however, with a criminal prosecution based upon an allegation that a member of Congress abused his position by conspiring to give a particular speech in return for remuneration from private interests. However reprehensible such conduct may be, we believe the Speech or Debate Clause extends at least so far as to prevent it from being made the basis of a criminal charge against a member of Congress of conspiracy to defraud the United States by impeding the due discharge of government functions.

*United States v. Johnson, supra* at 179–80, 86 S.Ct. at 755.

In the most recent Supreme Court case dealing with the Speech or Debate Clause, Chief Justice Burger said:

The Clause is a product of the English experience. *Kilbourn v. Thompson, supra* ; *United States v. Johnson, supra*, 383 U.S. at 177–179, 86 S.Ct. at 753–755. Due to that heritage our cases make it clear that the "central role" of the Clause is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary, *United States v. Johnson*, 383 U.S. 169, 181, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966)," *Gravel v. United States, supra*, 408 U.S. at 617, 92 S.Ct. at 2623. That role is not the sole function of the Clause, however, and English history does not totally define the reach of the Clause. Rather, it "must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government . . . ." *United States v. Brewster, supra*, at 508, 92 S.Ct. at 2535. Thus we have long held that, when it applies, the Clause provides protection against civil as well as criminal actions, and against actions brought by private individuals as well as those initiated by the Executive Branch. *Kilbourn v. Thompson, supra* ; *Tenney v. Brandhove, supra* ; *Doe v. McMillan* [412 U.S. 306, 93

S.Ct. 2018, 36 L.Ed.2d 912] *supra* ; *Dombrowski v. Eastland* [387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577] *supra.*

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502–03, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975).

*See also Doe v. McMillan*, 412 U.S. 306, 311, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Dombrowski v. Eastland*, 387 U.S. 82, 84, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).

By citing these Supreme Court cases, we do not suggest that any one of them supplies precisely controlling law as to our present case.

The Courts of Appeals do supply well-argued opinions on both sides of the general question we confront here: *United States v. Craig*, 528 F.2d 773 (7th Cir.), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976) [*Craig I*]; *United States v. Craig*, 537 F.2d 957 (7th Cir.) (en banc) [*Craig II*], *cert. denied sub nom. Markert v. United States*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 609 (1976); *United States v. DiCarlo*, 565 F.2d 802 (1st Cir. 1977); *In re Grand Jury Proceedings*, 563 F.2d 577 (3d Cir. 1977).

While we respect the views of the judges in the Seventh and First Circuits who have rejected the existence of a common law speech or debate privilege, we feel, as did the Seventh Circuit dissenters and the Third Circuit majority, that the long history and the felt need for protection of legislative speech or debate and the repeated and strong recognition of that history in the cases we have cited from the Supreme Court, fully justify our affirming Chief Judge Brown in his protection of the privilege in this case.

We should also comment upon the government's argument *in terrorem* that for the federal courts to recognize the speech or debate privilege for this Tennessee State Senator would open the door to similar claims on behalf of members of lesser legislative bodies like city councils and county boards. This opinion, however, affords no basis for such an extension. Nor will it until and unless a history of "reason

and experience" within the meaning of Rule 501 can be cited, which includes recognition of a speech or debate immunity or privilege for city councilmen or county board members in the constitutions of a large majority of the states of the union. This record and our research do not indicate that any state has as yet granted such recognition.

## THE EXTENT OF THE PRIVILEGE

█ Since we affirm the District Judge in holding that Gillock is entitled to a common law speech or debate privilege, we turn to the question also posed in this appeal as to the extent of the privilege. The District Court suppressed Items 3, 8, 9, 11, 12, 13 (found in the Appendix) and the governor's veto letter, *infra*. The government concedes that if the privilege is recognized, Items 9, 11, and 13, which deal directly with Gillock's legislative activity are correctly excluded. It, however, claims that the following items are not part of the legislative process and hence should be admitted at trial:

Item No. 3: (a) On March 6, 1975, the defendant made an official request in writing for an opinion from the Attorney General concerning "Extradition on a Misdemeanor." The request was made to Ray Ashley, Attorney General, with carbon copy to the Assistant Attorney General who had represented the state at the extradition hearing. (A copy is attached as Exhibit A.)

(b) On March 13, 1975, the defendant's request was routed to the Assistant Attorney General for preparation of a reply. (Attached as Exhibit B.)

(c) On March 27, 1975, the Office of the Attorney General rendered an opinion in response to the defendant's request. (Attached as Exhibit C.)

\* \* \* \* \* \*

Item No. 8: On March 25, 1975, Howard recorded a call from the defendant, during which the defendant advised her, in substance, that he had caused the extradition to be held up and could have blocked the extradition because the ex-

tradition hearing officer had appeared before the defendant's committee on a matter concerning the budget for the department of government headed by the extradition hearing officer. (A copy of the transcript is attached as Exhibit H.)

\* \* \* \* \* \*

Item No. 12: While the legislation was awaiting approval from the Governor, several individuals, some representing Electrical workers and other unions, went to see the defendant to urge him to withdraw the legislation. They explained to the defendant that the legislation was dangerous, that it would break down licensing ordinances, and that it would result in higher insurance premiums for the general public. The defendant responded that he had already accepted fees ($5,000 from 4 or 5 people) which would have to be refunded if the bill did not pass. After listening to their arguments, the defendant conceded that his bill could have adverse effects, but he implied that he had already spent the fees he had accepted and did not have the funds to make the refund that would be necessary if he withdrew the legislation. The defendant then suggested to at least one of the individuals that if he or the unions could supply the money needed to make the refunds then he could withdraw the legislation. The defendant's suggestion was rejected.

The proof would show that the individuals who had met with the defendant to urge him to withdraw the legislation, and others, then contacted the Governor, explained their opposition to the Governor, and explained the defendant's position to the Governor. On April 3, 1972, the Governor vetoed Senate Bill 1783. (A copy of the veto message is attached as Exhibit M.)

\* \* \* \* \* \*

April 3, 1972
Dear Mr. Speaker:
I hereby veto Senate Bill 1783.
This legislation would require any municipal government with a population of 39,-000 or more or any county government

with a population of 65,000 or more which licenses any trade, craft, service or occupation to license any individual who makes proper application without further examination if that individual has been duly licensed or otherwise authorized to perform the trade, craft, service, or occupation in any city of the state with a population of 39,000 or more or any county in the state with a population of 65,000 or more. This means that any person licensed by the government of Nashville, Memphis, Knoxville, Chattanooga, Jackson, Shelby County, Knox County, or Madison County would be able to practice his occupation in any of these jurisdictions without further examination or without meeting specific requirements established by the jurisdiction from which he is seeking authorization.

The changes anticipated by this legislation would be well founded, in my judgment, only if there were some uniformity in examinations or licensing standards from one jurisdiction to another throughout the state. But there is no doubt that standards vary greatly from one jurisdiction to another and that this reciprocity procedure would tend to undermine the control which local officials exercise over licensing in their jurisdictions.

Proponents of this measure have contended that the exclusive control by local licensing boards over the right to do business within a jurisdiction has tended to create monopolies among contractors or has had a depressing effect on competition. If this is the case and this problem does exist, such situations clearly need rectifying. But I fail to see that this legislation would alleviate those circumstances. I believe that, rather, it would undermine the effective control of elected local representatives and their authorized boards over the regulation of services which vitally affect local citizens.

Before establishing such reciprocity, I believe the General Assembly should consider the feasibility of establishing uniform examinations and licensing standards throughout the state. Once such uniformity is established, it very well may be appropriate to consider reciprocity among local jurisdictions—including all local governments in the state and not just those twelve jurisdictions mentioned in this legislation. It is the consumer whom the statutory law should protect by establishing certain standards of competency.

It is for these reasons that I take this action.

Sincerely,<br>/S/ Winfield Dunn

We believe that the extent of the privilege granted in this case must be measured by the Supreme Court's views on the extent of immunity granted by the United States Constitution's Speech or Debate Clause, since the values protected by each are basically identical. Having said this does not, however, easily resolve the question of the admissibility of the four items above. While there is broad general language in older cases dealing with the clause, in more recent cases the Supreme Court majority has narrowed the immunity granted to members of Congress.

In 1881, in the first case in which the Supreme Court construed the Speech or Debate Clause, it held that immunity extended to all "things generally done in a session of [Congress] by one of its members in relation to the business before it." *Kilbourn v. Thompson*, 103 U.S. 168, 204, 26 L.Ed. 377 (1881). This broad standard could arguably extend immunity to almost any act of a Congressman "relating to" the exercise of his powers of office, providing only that similar acts were "generally done" by other members of Congress.

In 1966, however, the Supreme Court held that the Constitutional immunity did not apply to prosecutions which do not "draw in question the legislative acts of the defendant member of Congress or his motives for performing them." *United States v. Johnson*, 383 U.S. 169, 185, 86 S.Ct. 749, 758, 15 L.Ed.2d 681 (1966). The Court added:

No argument is made, nor do we think that it could be successfully contended,

that the Speech or Debate Clause reaches conduct, such as was involved in the attempt to influence the Department of Justice, that is in no wise related to the due functioning of the legislative process. *United States v. Johnson, supra* at 172, 86 S.Ct. at 751.

Then in 1972, Chief Justice Burger, writing for a majority of six, specifically narrowed the interpretation which might otherwise be placed on earlier cases:

It is well known, of course, that Members of the Congress engage in many activities other than purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate "errands" performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called "news letters" to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause. Careful examination of the decided cases reveals that the Court has regarded the protection as reaching only those things "generally done in a session of the House by one of its members in relation to the business before it," *Kilbourn v. Thompson, supra*, at 204, or things "said or done by him, as a representative, in the exercise of the functions of that office," *Coffin v. Coffin*, 4 Mass. 1, 27 (1808).

\* \* \* \* \* \*

In no case has this Court ever treated the Clause as protecting all conduct *relating* to the legislative process. In every case thus far before this Court, the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process—the *due* functioning of the process.[10] Appellee's contention

[10] *See Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1881) (voting for a resolution); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (harassment of witness by state legislator during a legislative hearing; not a Speech or Debate Clause case); *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966) (making a speech on House floor); *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (subpoenaing records for committee hearing); *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (voting for a resolution).

In *Coffin v. Coffin*, 4 Mass. 1 (1808), the state equivalent of the Speech or Debate Clause was held to be inapplicable to a legislator who was acting outside of his official duties.

for a broader interpretation of the privilege draws essentially on the flavor of the rhetoric and the sweep of the language used by courts, not on the precise words used in any prior case, and surely not on the sense of those cases, fairly read.

*United States v. Brewster*, 408 U.S. 501, 512–13, 515–16 & n. 10, 92 S.Ct. at 2537 (1972).

This view was still further spelled out in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), where a 5–4 Court held that Senator Gravel's arrangement to publish the Pentagon Papers was not protected by the Speech or Debate Clause:

Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or

debate in either House, but "only when necessary to prevent indirect impairment of such deliberations." *United States v. Doe*, 455 F.2d [753], at 760.

Here, private publication by Senator Gravel through the cooperation of Beacon Press was in no way essential to the deliberations of the Senate; nor does questioning as to private publication threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence. The Senator had conducted his hearings; the record and any report that was forthcoming were available both to his committee and the Senate. Insofar as we are advised, neither Congress nor the full committee ordered or authorized the publication. We cannot but conclude that the Senator's arrangements with Beacon Press were not part and parcel of the legislative process.

There are additional considerations. Article I, § 6, cl. 1, as we have emphasized, does not purport to confer a general exemption upon Members of Congress from liability or process in criminal cases. Quite the contrary is true. While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts. If republication of these classified papers would be a crime under an Act of Congress, it would not be entitled to immunity under the Speech or Debate Clause.

*Gravel v. United States, supra* at 625–26, 92 S.Ct. at 2627 (footnote omitted).

*See also Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), and *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).

Our review of these cases convinces us that only one of the four items which we deal with in this section should have been suppressed. That one is Item 3(a), *supra* —Gillock's request for an opinion as to the constitutionality of extradition for a misdemeanor. Even though there was no specific legislation at that time authorizing a legislator to make such a request, *see* TCA § 8–609(6) (1973 ed. & 1977 Cum.Supp.), this request directly related to the legislative process.

As to Items 8, 12 and the Governor's veto message, we believe they are admissible under the standards of *United States v. Brewster, supra,* and later cases. Gillock has no right to claim his speech or debate privilege as to the Governor's exercise of the gubernatorial right of veto. Items 8 and 12 appear to us to be well outside of the ambit of legislative activity.

For the reasons set forth above, the judgment of the District Court is modified by our ruling that Items 8, 12 and the Governor's veto message are admissible and in all other respects is affirmed.

WEICK, Circuit Judge, dissenting.

The Speech or Debate privilege for state legislators provided in the Constitution of the State of Tennessee is relevant only where state law is applicable, and affords no protection to state legislators who are being prosecuted in a federal court for committing a federal crime. In a federal prosecution the existence of a privilege of a witness is to be determined by the federal law of evidence. *United States v. Craig*, 537 F.2d 957, 958 (7th Cir. *en banc,* 1976), *cert. denied sub nom., Market v. United States,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976).

The Speech or Debate privilege provided in the Constitution of the United States applies only to Congressmen, and not to state legislators. *United States v. DiCarlo*, 565 F.2d 802 (1st Cir. 1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978).

There is no federal common law speech or debate privilege protecting state legislators who commit federal crimes. *United States*

*v. DiCarlo, supra; United States v. Craig, supra.* It is submitted that at this late date the federal courts ought not to innovate and create a new privilege for the protection of state legislators who violate the criminal laws of the United States. The relevant and material evidence of all of their acts in committing federal crimes should be admitted in evidence, including legislative acts and motivations therefore, which ought not to be suppressed. It is not unreasonable to believe that public confidence in the administration of justice in the federal courts will be undermined if state legislators are permitted to violate, with impunity, the criminal statutes of the United States because of a court-created special privilege in their favor, but not in favor of any other person, which privilege results in the suppression of relevant and material evidence of the criminal conduct of the state legislators.

## I

Under Rule 26 of the Federal Rules of Criminal Procedure the admissibility of a witness' testimony is governed by Acts of Congress, the Federal Rules of Evidence, or other rules adopted by the Supreme Court. Rule 501 of the federal Rules of Evidence specifically addresses the issue of privilege, and provides as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the *courts of the United States* in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law. [Emphasis added.]

Under Rule 501 the privilege of a witness in a federal criminal prosecution is governed, not by state law, but by the principles of the common law as interpreted by the federal courts in the light of reason and experience.

It is clear that under the last sentence of Rule 501 the state law of privilege is to be applied only in civil actions or proceedings where state law supplies the rule of decision. State law does not supply the rule of decision in a federal criminal prosecution. Certainly the present case is not a civil action or proceeding, but is a federal prosecution of a state senator for accepting bribes in violation of the Hobbs Act. Reliance by the District Judge and by the majority opinion here, on Rule 501 for a federal privilege to suppress evidence of the state senator's acts in accepting bribes, is misplaced. No license to state legislators to accept bribes in violation of federal criminal statutes can be found in the federal common law, or in Rule 501.

The two Federal Appellate Courts that have considered the specific problem presented by this appeal have denied the existence of the asserted privilege. In the first case to consider the question, *United States v. Craig,* 528 F.2d 773 (1976), a majority of a panel of the Seventh Circuit held that a state legislator was entitled to a federal common law speech or debate privilege in a federal criminal prosecution, but that he had waived such privilege. On rehearing *en banc, United States v. Craig,* 537 F.2d 957 (7th Cir.), *cert. denied sub nom., Markert v. United States,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976), a majority of the *en banc* court, adopting the opinion of concurring panel member Judge Tone, held that no such privilege exists, and reversed the order of the District Court suppressing evidence of the defendant's legislative acts and legislative motivations, and remanded with instructions to deny the motion to suppress.

Similarly, the First Circuit in *United States v. DiCarlo,* 565 F.2d 802 (1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978), in affirming the convic-

tion of two state legislators for violations of the Hobbs Act and Travel Act, held that the Speech or Debate Clause in the Federal Constitution does not apply, nor purport to apply, to state legislators, and that the federal common law recognizes no speech or debate privilege applicable in a federal criminal prosecution of a state legislator.

The only other Court to consider the matter is the Third Circuit in *In re Grand Jury Proceedings*, 563 F.2d 577 (1977). There the Court, in dictum, recognized the existence of the privilege, rejected the decision of the *en banc* court in *United States v. Craig, supra*, and instead, followed the reasoning of the overruled panel majority. Gibbons, Circuit Judge, concurred in the result. In Judge Gibbons' opinion he stated that federal criminal law is as fully applicable to state legislators as it is to any other resident of the United States. He disagreed with the majority's dictum that there is some sort of federal common law evidentiary privilege which permits state legislators to decline to testify about their legislative acts or motivations for those acts.

We should follow the decisions of the *en banc* court in *United States v. Craig, supra*, and the First Circuit in *United States v. DiCarlo, supra*, and the concurring opinion of Judge Gibbons in *In re Grand Jury Proceedings, supra*. Accordingly, we should hold that the common law, as interpreted in the light of reason and experience, does not afford a state legislator a speech or debate privilege in a federal criminal prosecution.

## II

The purpose of a trial is to determine the truth, which can never be ascertained if we invent new privileges to withhold or to suppress relevant and material evidence.

Federal courts, in consonance with the ancient maxim that the "public has a right to every man's evidence," 8 J. Wigmore, Evidence § 2192 at 70 (McNaughton rev. ed. 1961), should not create a new privilege in the absence of good reason therefor.

The investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of . .

privileges. They should be recognized only within the narrowest limits required by principle. Every step beyond these limits helps to provide, without any real necessity, an obstacle to the administration of justice. [Footnote omitted.]

*Id.* § 2192 at 73. *Accord, United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

The history of the speech or debate privilege indicates that it extends directly to the bitter and protracted struggle for power between the Crown and Parliament, which disrupted England for centuries, *United States v. Johnson*, 383 U.S. 169, 178, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), *Tenny v. Brandhove*, 341 U.S. 367, 372, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). This conflict was characterized by the harassment of members of Parliament who criticized the Crown, the Crown contending that there was no privilege with respect to matters relating to its prerogatives, and Commons claiming an absolute privilege of speech or debate in connection with any subject touching parliamentary matters. 4 W. Holdsworth, A History of English Law 89–93 (2d ed. 1937).

It was this conflict, developed over the respective powers of two coordinate branches of the Government, executive and legislative, that was at the core of the development of the privilege. Thus, when viewed as a derivative of the historical processes that created it, it becomes apparent that the speech or debate privilege has relevance only in the context of a single Government.

The Supreme Court, in interpreting the Federal Speech or Debate Clause, has recognized the historic purpose of the privilege as the preservation of legislative independence and integrity in the context of a governmental system of separation of powers. In *United States v. Brewster*, 408 U.S. 501, 508, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), the Court stated:

Although the Speech or Debate Clause's historic roots are in English history, it must be interpreted in light of the American experience, and in the context

of the American constitutional scheme of government rather than the English parliamentary system. We should bear in mind that the English system differs from ours in that their Parliament is the supreme authority, not a coordinate branch. Our speech or debate privilege was designed to preserve legislative independence, not supremacy. Our task, therefore, is to apply the Clause in such a way as to insure the independence of the legislature without altering the historic balance of the three co-equal branches of Government. [Footnote omitted.]

To the same effect, see *Gravel v. United States*, 408 U.S. 606, 616, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), in which the Court stated:

The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch. It thus protects Members against prosecutions that directly impinge upon or threaten the legislative process.

[*Id.* at 616, 92 S.Ct. at 2622]

[T]he central role of the Speech or Debate Clause [is] to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary, *United States v. Johnson*, 383 U.S. 169, 181 (1966) . . . .

[*Id.* at 617, 92 S.Ct. at 2623]

*See also Doe v. McMillan*, 412 U.S. 306, 311, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

There being no problem of separation of powers between the federal government and a state legislator, *Elrod v. Burns*, 427 U.S. 347, 352, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a federal common law speech or debate privilege cannot logically exist.

This conclusion is reinforced by the fact that none of the decisions of the Supreme Court recognizes such a privilege. *Tenny v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), upon which the defendant relies heavily in support of his contention that the federal common law recognizes a speech or debate privilege applicable to state legislators, was not decided on that basis. Even though the Supreme Court in *Tenny* discussed at some length the speech or debate privilege, its holding was quite narrow, namely, that legislators are immune from civil suits for money damages brought under the Civil Rights Act (now codified at 42 U.S.C. §§ 1983, 1985) for their legislative acts. In *Tenny* the Court was not applying a federal common law speech or debate privilege, but rather, was applying the common law doctrine of official immunity. *In re Grand Jury Proceedings, supra* at 581; *United States v. Craig*, 528 F.2d 773, 782 (1976); *see United States v. DiCarlo*, 565 F.2d 802, 806 (1977).

Furthermore, I have been unable to find any decision of a federal appellate court, other than the dictum in *In re Grand Jury Subpoenas, supra*, that supports such a privilege. An indication that no federal common law speech or debate privilege exists can be discerned from the cases dealing with attempts to obtain injunctions against legislators. Although federal courts have declined to enjoin the acts of Congressmen, holding that such an interference with legislative acts would violate the Speech or Debate Clause of the Federal Constitution, *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); similar attempts to obtain injunctions against state legislators have been successful. *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *Jordan v. Hutcheson*, 323 F.2d 597 (4th Cir. 1963); *Bush v. Orleans Parish School Bd.*, 191 F.Supp. 871 (E.D.La.) (three-Judge District Court), *aff'd sub nom., Denny v. Bush*, 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961). Clearly if a federal common law speech or debate privilege exists, injunctive relief against state legislative action which violates federal law could not be granted.

Judges have no immunity for crimes committed by them during the terms of their office or prior thereto. *United States v.*

*Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. Manton,* 107 F.2d 834 (2d Cir. 1938). Nor have the judges any privilege to exclude evidence of crimes committed by them. In *Manton* the judge did not even question evidence showing that his opinions favored bribers. No federal official has ever been held exempt from prosecution for his commission of a federal crime.

In my opinion it is apparent that no speech or debate privilege has been extended to state legislators as a matter of federal common law. Rather, any protection afforded state legislators is based on the common law doctrine of official immunity. *United States v. DiCarlo, supra; United States v. Craig, supra.*

Although similar to the speech or debate privilege in its recognition of the need for government officials to be functionally independent, official immunity differs from the speech or debate privilege in significant respects. Some officials enjoy only a qualified immunity. Regardless of whether the immunity is absolute or qualified, its protection against liability for official acts does not extend to criminal prosecutions. *Imbler v. Pachtman,* 424 U.S. 409, 429, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *O'Shea v. Littleton,* 414 U.S. 488, 503, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Gravel v. United States,* 408 U.S. 606, 627, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *United States v. DiCarlo,* 564 F.2d 802, 806 (1977); *In re Grand Jury Subpoenas, supra* at 581; *United States v. Craig, supra; United States v. Anzelmo,* 319 F.Supp. 1106, 1118–19 (E.D. La.1970).

In *O'Shea v. Littleton, supra,* 414 U.S. at 503, 94 S.Ct. at 680, the Supreme Court stated:

> Whatever may be the case with respect to civil liability generally, see *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), or civil liability for willful corruption, see *Alzua v. Johnson,* 231 U.S. 106, 110–111, 34 S.Ct. 27, 58 L.Ed. 142 (1913); *Bradley v. Fisher,* 13 Wall. 335, 347, 350, 354, 20 L.Ed. 646

(1872), we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. Cf. *Ex parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1880). On the contrary, the judicially fashioned doctrine of official immunity does not reach "so far as to immunize criminal conduct proscribed by an Act of Congress . . . ." *Gravel v. United States,* 408 U.S. 606, 627, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

Because official immunity affords no protection from criminal liability for acts committed in an official capacity, it follows logically that in a criminal prosecution of a government official, official immunity provides no evidentiary privilege against disclosure of his official acts or the motivation for them comparable to that accorded to Congressmen by their speech or debate privilege. *United States v. DiCarlo, supra* at 806–07; *United States v. Craig, supra.*

### III

I am of the opinion that neither reason nor authority supports the transformation of the doctrine of official immunity into a federal common law speech or debate privilege. Nothing in our history, nor in any of the authorities cited by the defendant or relied upon by the dictum of the Third Circuit or the panel majority in *United States v. Craig, supra,* involved abuses of the type which would warrant the creation of such a privilege, namely, interference by the federal government with the independence of state legislators. I believe, however, that the nature of the American judicial and political systems makes remote such a possibility of interference. Before any prosecution against a state legislator can succeed the federal government must convince both a grand jury and a petit jury of the legislator's corruption. This Court should be unwilling to assume that these bodies will act against a state legislator without the requisite proofs. Cf. *United States v. Brewster,* 408 U.S. 501, 522 n. 16, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

Because the federal government can prosecute state legislators for violations of the federal criminal law, *In re Grand Jury Subpoenas, supra; United States v. Craig, supra; cf. United v. Brewster, supra,* we see no substantial increment in federal power over state legislators resulting from denial of the privilege. Indeed, the exclusion from evidence of legislative acts and legislative motivations may well make a conviction of a state legislator for violation of federal criminal law impossible.

To permit state legislators to avoid with impunity federal criminal liability for their official acts, "perhaps even more than the increased [federal] power, would gravely undermine legislative integrity and defeat the right of the public to honest representation." *United States v. Brewster, supra* at 524–25, 92 S.Ct. at 2543.

Furthermore, an examination of the consequences of a holding that recognizes a federal common law speech or debate privilege for state legislators strongly militates against its adoption. By recognizing such a privilege the Court would eventually become enmeshed in a quagmire of complex policy decisions, such as whether the privilege extends beyond state legislators to the plethora of other state legislative and quasi-legislative bodies such as city councils and school boards, and whether the privilege applies to civil as well as criminal proceedings. *In re Grand Jury Proceedings, supra* at 586–87 (Gibbons, J., concurring).

These questions are best left for Congress, which "at the federal level . . . has freedom to determine whether a statutory [speech or debate] privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate." *Branzburg v. Hayes,* 408 U.S. 665, 706, 92 S.Ct. 2646, 2669, 33 L.Ed.2d 626 (1972).

Because there is no federal common law speech or debate privilege, it is not necessary to discuss the second issue presented by this appeal, namely, whether the District Court properly applied the privilege to all items of evidence suppressed.

The suppression order of the District Court should be reversed and the case remanded with directions to deny the motion to suppress.

## APPENDIX

### UNITED STATES OF AMERICA,
v.
### EDGAR H. GILLOCK

CR–76–104.

United States District Court,
W. D. Tennessee, W. D.

Sept. 1, 1977.
OFFER OF PROOF

## I. PRELIMINARY STATEMENT

On December 3, 1976, after pre-trial motions and argument, the Court entered an Order suppressing the introduction of any evidence concerning the defendant's "legislative acts and motivation therefor." Upon appeal from that Order, the Court of Appeals vacated the suppression order, finding that the appeal was premature because the suppression order "did not apply to particularized items of evidence," and remanded the case to this Court for further proceedings. The Court of Appeals suggested that the government file a formal bill of particulars or offer of proof setting forth specific categories of evidence or testimony to be tendered at trial.

The government will hereinafter set forth specific categories of evidence to be offered which may arguably be considered "legislative acts" or "motivation therefor."

The government will attempt to set forth in detail all such evidence, based on all the information available to the government at this time. In doing so, it will be necessary to set forth and outline some evidence which clearly would not be covered by the Court's suppression order, so that the relevance and relative importance of the evidence which might be covered can be examined in context.

Since the Court's original order suppressed not only legislative acts, but also

any evidence of "motivation therefor," much of the evidence to be set forth will concern conversations between the defendant, or his agent,[1] and others both before and after any actual legislative activity.

In response to the Court's instructions, only an offer of proof will be made at this time, and such offer will be made on the assumption that federal courts recognize a common law speech or debate immunity. A memorandum of points and authorities opposing suppression of the evidence set forth herein—and preserving for the record the government's position that there is no such immunity for state legislators charged with federal crimes—will be filed separately at a later date.

While there necessarily will be some overlap, particularly with regard to Count Seven, the proffered evidence will be set forth as it relates to particular counts by numbered, itemized categories.

## II. COUNT ONE

In count one the indictment charges, in substance, that between January 1, 1975, and March 25, 1975, the defendant, being aided and abetted by John Hundley, attempted to obtain money from Ruth Howard by using his influence as an elected member of the Tennessee General Assembly in furtherance of a plan to block the extradition of James Michael Williams from Tennessee to Illinois.

The proof would show that on November 15, 1974, Williams was arrested in Memphis and was held as a fugitive from Illinois. In December and January, Ruth Howard, Williams' sister, came to Memphis to meet with Williams' attorney, John Hundley. In January, Hundley told Howard he had a "friend" who could help her brother, but it would "cost a small sum of money." During her visit to Memphis Hundley introduced Howard to the defendant.

*Item No. 1:* In March, 1975, Hundley and Howard went to Nashville for Williams' extradition hearing. Howard and Hundley met with the defendant before the hearing and Hundley advised Howard that the defendant could help her brother, but that the defendant needed "$1,500.00 now and $1,000.00 later." Howard and the defendant then discussed the details of the payments.

*Item No. 2:* (a) On or about March 6, 1975, the defendant appeared during the extradition hearing for Williams. When Charles Grigsby, the extradition hearing officer, questioned the defendant's presence, he stated that he was not there as an attorney or in his official capacity as a State Senator. However, during the hearing, the defendant questioned David Raybin, the Assistant Attorney General, about the propriety of extraditing on a misdemeanor charge.[2]

(b) During the hearing the defendant requested the Assistant Attorney General's file and reviewed the extradition papers.

(c) The defendant then asked the Assistant Attorney General to step out into the hall for a private conversation. At that time the defendant asked the Assistant Attorney General to postpone the hearing until after the Attorney General could render an official opinion on the question of extradition on a misdemeanor charge. The defendant was advised that he was entitled to an opinion from the Attorney General, but that he would have to make his request in writing through proper channels. (The defendant was entitled to request an opinion from the Attorney General by virtue of his status of State Senator. Only government offi-

---

1. Some of the evidence to be set forth that relates to Count One will concern third-party conversations that occurred when the defendant was not present. It will be the contention of the government that those statements are admissible and constitute statements of the defendant because the proof will establish that the defendant and his agent were engaged in a common scheme or plan. *See United States v.* *Perna,* 491 F.2d 253 (6th Cir. 1974), *cert. denied,* 417 U.S. 934, 94 S.Ct. 2646, 41 L.Ed.2d 237.

2. Williams had been serving a sentence in Illinois for reckless or disorderly conduct when he escaped and was subsequently picked up in Memphis.

cials, not attorneys, have the prerogative to request opinions.)

(d) The defendant then suggested to the Assistant Attorney General that there was legislation "in the making" to prohibit the Governor from extraditing on a misdemeanor. The Assistant Attorney General rejected that suggestion on the grounds that extradition was a Constitutional question.

*Item No. 3*: (a) On March 6, 1975, the defendant made an official request in writing for an opinion from the Attorney General concerning "Extradition on a Misdemeanor." The request was made to Ray Ashley, Attorney General, with carbon copy to the Assistant Attorney General who had represented the state at the extradition hearing. (A copy is attached as Exhibit A.)

(b) On March 13, 1975, the defendant's request was routed to the Assistant Attorney General for preparation of a reply. (Attached as Exhibit B.)

(c) On March 27, 1975, the Office of the Attorney General rendered an opinion in response to the defendant's request. (Attached as Exhibit C.)

*Item No. 4*: (a) After the extradition hearing the defendant told Howard he had "a friend in the governor's office who, when paid off, would see to it that the extradition papers would never reach the governor." The defendant then asked Howard if she was sure she could raise the money, and when she told him she was sure, he instructed her to make the down payment in cash, and then disguise the balance as attorney's fee by executing a promissory note.

(b) On March 7, 1975, Howard and Williams executed a promissory note to the defendant and Hundley for $1,500.00.

*Item No. 5*: On March 18, 1975, Howard recorded a telephone call to Hundley, during which Hundley told Howard, in substance, that he had been in contact with the defendant, that he had told the defendant she had not yet paid the money, and that the defendant had told him he could still block the extradition if he got the money by the following Monday or Tuesday. (A copy of the transcript is attached as Exhibit D.)

*Item No. 6*: On March 19, 1975, Howard recorded a telephone call from Hundley, during which Hundley told Howard, in substance, that the defendant had told him it would take him two or three days to get Williams out of jail after the defendant got the money. (A copy of the transcript is attached as Exhibit E.)

*Item No. 7*: (a) On March 21, 1975, Howard drove from St. Louis, Missouri, to Memphis for the purpose of making the $1,000.00 cash payment to the defendant.

(b) After her arrival in Memphis, Howard recorded a telephone call to Hundley, during which Hundley advised Howard, in substance, that he had been in contact with the defendant and the defendant had told him it was too late to block the extradition. (A copy of the transcript is attached as Exhibit F.)

(c) During the evening of March 21, 1975, Howard recorded several face-to-face conversations with Hundley, during which Hundley advised Howard, in substance, that the defendant could have blocked the extradition if he had received the money in time. (A copy of the transcript of excerpts[3] of that recording is attached as Exhibit G.)

*Item No. 8*: On March 25, 1975, Howard recorded a call from the defendant, during which the defendant advised her, in substance, that he had caused the extradition to be held up and could have blocked the extradition because the extradition hearing officer had appeared before the defendant's committee on a matter concerning the budget for the de-

---

**3.** The entire transcript, which is 33 pages, is being furnished to counsel for the defendant. Only selected excerpts have been attached as an exhibit because the government does not believe that the omitted portions could in any way constitute motivation for legislative action. If the government is wrong in this assumption, and the defendant's attorneys contend the omitted portions are covered by the Speech or Debate Immunity, then the transcript will be available for presentation to the Court.

partment of government headed by the extradition hearing officer. (A copy of the transcript is attached as Exhibit H.)

*Item No. 9*: (a) On March 19, 1975, the defendant participated in a hearing conducted by the Senate Judiciary Committee, of which he was a member in the Tennessee Senate.

(b) During that hearing, Charles Grigsby, head of the Tennessee Law Enforcement Academy, appeared before the committee on a matter concerning the budget of the Tennessee Law Enforcement Academy.

## III. COUNTS THREE—SIX

In counts three through six the Indictment charges, in substance, that between February 1, 1972, and April 7, 1972, the defendant attempted to obtain money from four named individuals by using his influence as an elected member of the Tennessee General Assembly in furtherance of a plan to guarantee the named individuals a master electrician's license.

The proof would show that in Tennessee before an electrical contractor can engage in electrical work the contractor must either have or employ someone who has a master electrician's license issued by the particular county or municipality in which the electrical work is to be done. In Shelby County, because of the complexity of the electrical code, the test administered to those seeking a master's license is extremely difficult, and therefore, the master's license is very valuable.

In early 1972, one of the four individuals named in counts three through six contacted the defendant to see if the defendant could be of assistance in obtaining a master's license. Subsequently, in late January or early February some or all of the four individuals met with the defendant and explained to him that they had been unable to obtain a master's license by passing the test. At that time, the defendant advised them that if he could find a way to get them a license he would let them know.

*Item No. 10*: Approximately two weeks after the initial meeting the defendant called and asked the four individuals to come to his office. The defendant advised them that he had a way to enable them to obtain a master's license, but that it would cost them $5,000 each. The defendant explained that he could cause legislation to be enacted by the Tennessee General Assembly which would provide for reciprocity in licensing. The legislation would enable an individual who could not pass the difficult test in Shelby County, or Memphis, to obtain a license in another county, or municipality, where the test was not as difficult, and then require the larger county or municipality to recognize the master's license obtained elsewhere. The defendant explained that the $5,000 fee would be on a contingency basis, that is, if the individuals, or at least one of them, did not obtain their master's license within one year, their money would be refunded. Shortly thereafter, two of the four individuals put $5,000 in escrow pursuant to the defendant's proposition. One of the individuals had the defendant execute a written agreement. (A copy of that agreement is attached at Exhibit I.)

*Item No. 11*: (a) On March 6, 1972, the defendant introduced Senate Bill Number 1783, styled: "AN ACT to provide for reciprocity by municipalities and counties in this state to persons licensed or regulated to engage in a trade, craft, service or occupation." (A copy is attached as Exhibit J.)

(House bill Number 1888 had previously been introduced on March 3, or March 4, 1972. A copy is attached as Exhibit K.)

(b) On March 22, 1972, House Bill Number 1888 was substituted for Senate Bill Number 1783. On March 23, 1972, the defendant proposed an amendment to House Bill 1888 which, in effect, made the minimum population requirements conform to Jackson and Madison County. (A copy is attached as Exhibit L.)

(c) Any and all statements made by the defendant in support of the bill or bills, and the amendment thereto, were recorded in the normal course of business of the

Tennessee General Assembly and will be introduced as evidence. (Copies are maintained and can be obtained from the Senate and House Legislative Journals and the Library and Archives in Nashville.)

(d) The legislation as amended passed both branches of the legislature and was forwarded to the Governor.

The proof would show that shortly after he put his $5,000 in escrow for the defendant, Sammy Robbins received instructions to go to Jackson, Tennessee, and obtain a master electrician's license from that municipality.

*Item No. 12*: While the legislation was awaiting approval from the Governor, several individuals, some representing Electrical workers and other unions, went to see the defendant to urge him to withdraw the legislation. They explained to the defendant that the legislation was dangerous, that it would break down licensing ordinances, and that it would result in higher insurance premiums for the general public. The defendant responded that he had already accepted fees ($5,000 from 4 or 5 people) which would have to be refunded if the bill did not pass. After listening to their arguments, the defendant conceded that his bill could have adverse effects, but he implied that he had already spent the fees he had accepted and did not have the funds to make the refund that would be necessary if he withdrew the legislation. The defendant then suggested to at least one of the individuals that if he or the unions could supply the money needed to make the refunds then he could withdraw the legislation. The defendant's suggestion was rejected.

The proof would show that the individuals who had met with the defendant to urge him to withdraw the legislation, and others, then contacted the Governor, explained their opposition to the Governor, and explained the defendant's position to the Governor. On April 3, 1972, the Governor vetoed Senate Bill 1783. (A copy of the veto message is attached as Exhibit M.)

*Item No. 13*: (a) On April 13, 1972, the defendant moved to override the Governor's veto. The motion failed, seven "ayes", sixteen "no's" and two not voting.

(b) Any and all statements made by the defendant in support of his motion to override the veto of Senate Bill 1783 were recorded in the normal course of business of the Tennessee General Assembly and will be introduced as evidence.

*Item No. 14*: Subsequently, the two individuals who had put $5,000 in escrow received refunds from the defendant. All but $250 was refunded. The $250 was retained by the defendant as attorney's fees.

## IV. COUNT SEVEN

In count seven the Indictment charges, in substance, that between February 1, 1972, and April 7, 1972, and between January 1, 1975, and March 25, 1975, the defendant was employed and associated with an enterprise (being an elected member of the Tennessee General Assembly) and did engage in the affairs of said enterprise through a pattern of racketeering activity by performing the acts set forth in Counts One through Six and by agreeing to accept things of value in exchange for his promise to exercise his influence, judgment and prerogatives under color of office.

The proof offered in support of Count Seven would include all of the evidence set forth in items 1–14 herein, and would include evidence setting forth the dates and times the defendant acted in an official capacity while performing his duties and serving as an elected representative. Additionally, the proof would include an explanation of the general function of the Tennessee General Assembly, the legislative process in the State of Tennessee, and the rights, duties and obligations of an elected representative.

Respectfully submitted,

W. J. MICHAEL CODY
United States Attorney

By /s/ GLEN REID, JR.
Glen Reid, Jr.
Assistant United States Attorney

CERTIFICATE OF SERVICE

I, Glen Reid, Jr., Assistant United States Attorney for the Western District of Tennessee, certify that a copy of the foregoing Offer of Proof has been forwarded to defendant's attorneys of record: Hal Gerber, 100 North Main Building, Memphis, Tennessee 38103; and James Neal, Third National Bank Building, Nashville, Tennessee 37219, via United States Mail, postage prepaid, this 1st day of September, 1977.

/s/ GLEN REID, JR.
Glen Reid, Jr.
Assistant United States Attorney